## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Aug 13 2019, 9:50 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Danielle L. Flora
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

S.S. *(Minor Child)*
and
A.S. *(Father)*,
*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

August 13, 2019

Court of Appeals Case No.
19A-JT-222

Appeal from the Allen Superior Court

The Honorable Charles F. Pratt, Judge

The Honorable Sherry A. Hartzler, Magistrate

Trial Court Cause Nos.
02D08-1804-JT-125
02D08-1804-JT-126

**Robb, Judge.**

# Case Summary and Issue

[1] A.S. ("Father") appeals the termination of his parental rights to S.S. ("Child") and presents the sole issue of whether the juvenile court's order terminating his parental rights was clearly erroneous. Concluding it was not clearly erroneous, we affirm.

# Facts and Procedural History

[2] Child was born on August 25, 2003, to Father and C.S. ("Mother"). Father and Mother married in December of 2009 or 2010 but separated in December 2015. Mother also has another child, J.R.A., whose father is J.A.[1]

[3] The Department of Child Services ("DCS") initially became involved in this case in September 2015 due to concerns of lack of supervision. While Father, Mother, Child, and J.R.A. were living in a motel, DCS received a call that J.R.A., who was ten years old at the time, was seen on the motel's property unsupervised. On September 28, 2015, the juvenile court held a preliminary hearing and found that probable cause existed to believe J.R.A. and Child were children in need of services ("CHINS"). The State filed a petition alleging the

---

[1] Mother's rights as to Child and J.R.A., as well as J.A.'s parental rights as to J.R.A., were also terminated in the same order at issue. However, this appeal pertains only to S.S. and Father. Mother and J.A. do not participate in this appeal. Accordingly, we have limited our recitation of the facts to those pertaining to Father.

children to be CHINS pursuant to Indiana Code section 31-34-1-1.[2]  At a hearing on October 13, 2015, Father admitted that he is employed part-time, resides in a local motel with Mother and Child, is not able to provide independent and sustainable housing for his family, and would benefit from court intervention to provide services for himself and Child.  That same day, Child was adjudicated a CHINS.  As part of the parent participation plan, the juvenile court ordered Father to (among other things): refrain from criminal activity; maintain appropriate housing; provide Child with appropriate clothing; complete a diagnostic assessment at Quality Counseling and follow any recommendations; obtain and maintain employment; obey the terms of his probation; submit to drug testing by DCS; and complete home-based services including parenting classes, transportation, housing, employment, and parenting.  *See* Exhibits, Volume 1 at 22.

[4]  Child remained with Father and Mother at the motel for several months.  DCS requested a detention hearing to discuss the possibility of removing Child because Mother and Father were not complying with services.  Prior to the

---

[2] Specifically, the petition alleges:

> Inability, Refusal or Neglect, I.C. 31-34-1-1: The child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision.

Exhibits, Volume 1 at 147.

hearing, Mother contacted DCS and requested that Child be removed. In December 2015, Child was placed into foster care.

[5] Father was incarcerated numerous times in 2016: February/March 2016, March/April 2016, and July through September 2016. Following a permanency hearing on September 13, 2016, the juvenile court found that Father "failed to enroll or satisfactorily participate in the services and programs required in the dispositional decree [because Father] has been incarcerated in the Allen County Jail since July 21, 2016 on a probation violation[.]" *Id*. at 54. After his release in September 2016, Father was placed on work release through January 2017. After work release, Father maintained his own housing at the Wells Street Mobile Home Court from January through April 2017. Throughout the three years of this case, excluding these several months, Father did not maintain independent housing – he was either incarcerated, living in motels, or staying with friends. Nonetheless, in March 2017, the juvenile court ordered a plan for reunification of Child with Father. In the meantime, Child remained in foster care.

[6] In late August 2017, Father was incarcerated again for three days. On August 31, 2017, the juvenile court found that Father has failed to satisfactorily participate in services as required by the dispositional decree. At that time, Child's permanency plan was changed from reunification with Father to termination of parental rights with adoption. In January 2018, Father was incarcerated, and Child was placed with her maternal aunt. In February, the juvenile court held a permanency hearing and found Father failed to participate

in therapy, cooperate with home-based services, submit to drug screens, and comply with services before incarceration. Father admitted he was struggling with addiction. DCS subsequently filed a petition to involuntarily terminate Father's parental rights.

[7] Father was released from incarceration on June 27, 2018, and was ordered to live at the Thirteen Step House, a half-way house program, until December 2018 followed by three years of probation.

[8] A two-day hearing on the petition to terminate Father's rights took place on September 28 and October 3, 2018. At the hearing, Father testified that he used synthetic marijuana daily in 2016 and 2017, but in August 2017, he began using heroin daily until his incarceration in January 2018. Testimony also revealed that Father had been successful in maintaining sobriety while in the half-way house program although he was only several months into the program. Nonetheless, on December 31, 2018, the juvenile court issued its order terminating Father's parental rights, finding in relevant part:

> 55. The Court finds that leading up to [Father's] incarceration[,] he was convicted of Possession of Synthetic Marijuana in November 2017; Driving while Suspended, Criminal Mischief, and Driving While Intoxicated in August 2017.
>
> 56. Previously, Father had been incarcerated at Work Release from September 2016 through January 2017 after his probation was revoked.

57. The Court finds that from the time the underlying Child in Needs of Services matter began, Father had only had his own housing for a 4-month period from January 2017 through April 2017. Otherwise, he was living in motels, incarcerated, in work release or in a half-way house.

58. . . . [Father] has a total of eight (8) felony convictions in Allen County alone.

59. . . . [Father has] been abusing heroin[] on a daily basis from August 2017 through January 2018.

60. The Court finds that after his release in June 2018 Father immediately went into placement at the half-way house.

61. At the time of these proceedings, Father was participating in substance abuse treatment and moral recognition therapy through the orders of the criminal proceedings.

62. The Court finds . . . that although Father is compliant with the [Thirteen Step program], a prognosis of recovery cannot be given until someone is discharged from the program and maintains their recovery.

63. The Court finds that prior to or after [Father's] incarcerations he had not been compliant with therapy or home-based services.

64. . . . Father never participated in homebased casework or parenting classes with Whittington [Services]. . . .

65. The Court finds that Father was also referred to home based services with Sergi Church of Whittington. . . . Church worked with [Father] from October 2016 through May 2017.

66. When Church first met with [Father], he was on work release for the next six months. They established goals of employment, housing, parenting and accessing community resources.

67. Eventually Father stopped attending and participating in services and by the time of closure he had not addressed or completed any of the established goals, with the exception of a brief employment that had ended by May of 2017.

68. . . . [Father] participated in homebased casework and supervised visitation with [Child.] . . . The goals . . . were to address housing and employment as well as a parenting curriculum. The Court finds that [Father] worked with [Bruno Taylor] from September 2017 through November 2017.

69. The Court finds that one of the guidelines for visitation requires that a parent provide food if visitation occurs over meal time. . . . [T]his guideline was communicated to Father and his visitation[s] were scheduled from 4:00 p.m. through 8:00 p.m. once per week according to Father's availability.

70. By the time services ended Father was not employed and did not have independent housing.

71. [S]ervices ceased in November 2017 when Taylor obtained a protective order against Father.

72. [D]uring the course of a supervised visitation Father did not have food or the funds to provide a meal to his daughter. When Taylor provided him with options such as a meal at the rescue mission, Father refused and became agitated, loud, and told Taylor that "he was going to cause problems." Taylor feared [for] the safety of the [C]hild and feeling personally

threatened accepted Father's invitation to end the visitation. Whittington ultimately closed their services with Father as a result of the threat. The Court finds through Taylor that Father had not made progress in his goals to obtain independent housing and employment during the last two (2) months he worked with Whittington.

73.    Ultimately at the time of the termination proceedings, the Court also finds that Father had only had 4 visits in the year 2018 with [Child] and had not yet restarted his visitations at the time of the termination proceedings.

* * *

90.    . . . Guardian Ad Litem[] for [Child] contend[s] that termination is in the best interests of [Child] citing, failure to complete and participate in services, multiple incarcerations with respect to [Father], failure to maintain visitation[,] . . . and essential need of [Child] to have permanency. . . .

Appealed Order 11-13, 15. Based on these findings, the juvenile court concluded as follows:

6.    [Father] had . . . not obtained or demonstrated the stability necessary to provide care and supervision for [Child]. [He] has established a pattern of incarcerations, criminal activity, and drug use for which he has in fact not provided care or support for [Child]. Further, given Father's lengthy history of substance abuse, his recent participation in services related to his addiction does not discount the years of non-compliance in these proceedings. The Court would further note that any recent sobriety has only been accomplished with strict oversight and the threat of incarceration. For nearly three years the goal of reunification was not sufficient to motivate [Father].

7. [Father's] failure to follow through with services and visitation is indicative of [his] instability and inability to remedy the reasons for [Child's] removal and continued placement outside of [his] care.

8. . . . [T]ermination of parental rights and the plan for care and treatment for adoption will provide [Child] with the nurturance[,] care and protection [she] require[s]. It is therefore in [Child's] best interests that the petition to terminate parental rights be granted.

*Id.* at 16. Father now appeals. Additional facts will be provided as necessary.

# Discussion and Decision

## I. Standard of Review

The Fourteenth Amendment of the United States Constitution protects a parent's right to raise his or her children. *In re D.D.*, 804 N.E.2d 258, 264 (Ind. Ct. App. 2004), *trans. denied*. Although "[a] parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests[,]'" parental interests are not absolute and "must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Thus, the parent child relationship may be terminated when a parent is unable or unwilling to meet their parental obligations. *Id.* And a juvenile court need not wait until a child is irreversibly harmed such that her

physical, mental, and social development is permanently impaired before terminating parental rights. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). We are cognizant that involuntary termination of parental rights is the most severe action a juvenile court can take as it severs all rights of a parent to his or her child. *Matter of D.G.*, 702 N.E.2d 777, 780-81 (Ind. Ct. App. 1998). Therefore, termination is considered a last resort, "available only when all other reasonable efforts have failed." *Id*. at 781.

[10] Given the juvenile court's unique position, we review the termination of parental rights with great deference. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013). We do not reweigh the evidence or judge the credibility of the witnesses. *Bester*, 839 N.E.2d at 147. Instead, we consider the evidence and reasonable inferences most favorable to the juvenile court's judgment. *Id*. As required by Indiana Code section 31-35-2-8(c), the juvenile court entered findings of fact and conclusions of law when terminating Father's parental rights. Therefore, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings, then whether the findings support the judgment. *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015). We will set aside the juvenile court's judgment only if it is clearly erroneous, namely when "the findings do not support the [juvenile] court's conclusions or the conclusions do not support the judgment." *Bester*, 839 N.E.2d at 147 (internal quotation omitted).

## II. Statutory Requirements for Termination

To terminate the parent-child relationship, the State must prove by clear and convincing evidence:

> (B) that *one* (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> * * *
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (emphasis added); *see also* Ind. Code § 31-37-14-2 ("A finding in a proceeding to terminate parental rights must be based upon clear and convincing evidence."). "[I]f the court finds that the allegations in a petition described [above] are true, the court *shall* terminate the parent-child relationship." Ind. Code § 31-35-2-8(a) (emphasis added).

[12] Because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the juvenile court was only required to find that one of the elements of subsection (b)(2)(B) was established by clear and convincing evidence. *In re I.A.*, 903 N.E.2d 146, 153 (Ind. Ct. App. 2009). Here, the juvenile court concluded that there was a reasonable probability that the conditions, namely Father's instability, that led to Child's removal and continued placement outside his care will not be remedied.

## III. Termination of Father's Parental Rights

[13] Father challenges the juvenile court's conclusion that there is a reasonable probability that the conditions that led to Child's removal and continued placement outside of his care will not be remedied. Specifically, he argues there was insufficient evidence to support termination because "in the months immediately preceding the termination trial, [he] had made significant progress addressing his drug abuse." Brief of Appellant at 10. We begin by noting that Father does not appear to challenge any of the juvenile court's specific findings.[3] Therefore, these unchallenged findings are accepted as true. *McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997).

---

[3] In his brief, he lists the juvenile court's findings and states that "[w]hile the above findings may be considered accurate, none of them are true in the context of the evidence presented at the termination trial. For example, it is accurate that [Father] was abusing heroin on a daily basis from August 2017 through January 2018. However, no testimony was presented that [Father] continued to abuse illegal drugs after January, 2018." Brief of Appellant at 16. Here, it appears that Father is not actually challenging the juvenile court's findings but rather its conclusions drawn from the findings or omission of other more favorable findings.

[14]     In determining whether the conditions that led to removal are likely to be remedied, we engage in a two-step analysis: we first identify the conditions that led to Child's removal, and then determine whether there is a reasonable probability that those conditions will not be remedied. *K.E.*, 39 N.E.3d at 647. The second step requires the juvenile court to evaluate a parent's fitness to care for a child at the time of the termination hearing and consider a parent's pattern of conduct to determine whether there is a "substantial probability of future neglect or deprivation of the children." *In re T.F.*, 743 N.E.2d 766, 774 (Ind. Ct. App. 2001), *trans. denied*. In evaluating a parent's fitness, the juvenile court may properly consider a parent's criminal history, substance abuse issues, history of neglect, failure to provide support, lack of adequate housing and employment, and services offered by DCS to a parent and the parent's response to those services. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. Moreover, we have held a pattern of unwillingness to deal with parenting problems and to cooperate with counselors and those providing services, in conjunction with unchanged and unacceptable home conditions, supports a finding that there is no reasonable probability the unacceptable conditions in the home will be remedied. *Matter of D.B.*, 561 N.E.2d 844, 848 (Ind. Ct. App. 1990).

[15]     The record reveals that Child's continued placement outside Father's care was due to Father's lack of stability, including his lack of suitable housing, frequent incarcerations, substance abuse problems, and failure to successfully comply with services. First, Brandi Haywood, DCS caseworker, was assigned to the

case in December 2015 while Father, Mother, and Child were living in a motel. Haywood testified that Father completed a diagnostic assessment with Quality Counseling Psychological Services, which recommended that Father complete individual and home-based services. However, Father did not successfully complete either. In late 2015/early 2016, DCS referred Father to Angela Solano, a home-based caseworker, to go through parenting classes. At the termination hearing, Solano testified that Father did not complete parenting classes "[b]ecause he didn't show up[. W]e had our initial meeting and then after that he didn't show." Transcript, Volume 1 at 85. Therefore, Solano never had the opportunity to work with Father on any other home-based services.

[16] From October 2016 to May 2017 Father worked with Sergi Church, a home-based caseworker with Quality Counseling. Father established goals to obtain and maintain employment and housing and complete a parenting curriculum. When Father initially began services, he was in work release and Church assisted Father in looking for housing and employment. After completing work release, Father moved into the Wells Street Mobile Park and obtained employment with Patriot Tire, where he worked for approximately two months. Ultimately, however, services ended due to Father's lack of attendance. Church explained, "we attempted to meet with [Father] multiple times at his residence at the Well's [sic] Street Trailer Park [but] he would no-show or cancel at the last minute and then part of our attendance policy he never resumed services after that." *Id*. at 92. At the end of services, Father

"was working but he wasn't employed at an actual company he was doing jobs for other people[.]" *Id*. at 91. Although Father completed the housing goal, he did not complete the parenting curriculum and Church opined that the employment goal would not have been completed "because [Father] wasn't fully employed enough to maintain the housing and stability for his children." *Id*. at 93.

[17] Bruno Taylor, a home-based case manager, also testified at the fact-finding hearing. On September 28, 2017, DCS arranged for Taylor to complete home-based services with Father and supervise Father's visitations with Child. Taylor testified that Father was "very aggressive" during the services, which inhibited his ability to provide services. *Id*. at 57. Father "felt like he had been through the services once before . . . but [Taylor] did recommend certain ways of finding housing and finding other trailer homes" they could use during services. *Id*. Father completed applications for employment online and Taylor attempted to take Father to a temporary services agency, but Father refused. Father failed to obtain employment or independent housing during the services. Ultimately, services were terminated after two months because Father made threats toward Taylor and his company during a visitation. As a result, Taylor filed for and received a Protective Order against Father.

[18] With respect to housing, Father only had his own housing for a three- or four-month period in 2017. At all other times during the pendency of this case, Father was either incarcerated or living in motels. In fact, Father has been incarcerated five separate times since this matter began in 2015. Further, in its

order, the juvenile court found that Father had been convicted of eight felonies in Allen County alone.[4]  Most recently, Father was incarcerated from January 12, 2018 through June 27, 2018, and was ordered to complete a Restoration Court Program as part of his criminal case.  Following his release, Father immediately began the program at Thirteen Step House, which is a men's half-way house.  The program requires participants to attend AA meetings, remain drug free, work, obtain a sponsor, and attend counseling.  Father had successfully completed three months of the six-month program at the time of the termination hearing.  Father was expected to complete the program in December 2018 and would then begin three years of probation.

[19]  Stephen Swain, the house manager at the Thirteen Step House, testified that Father is required to "maintain gainful employment or he has to work more than 30 hours a week . . . [and] take random drug testing through me[ and] through house arrest[.]"  *Id*. at 236.  Swain also testified that Father was doing well in the program and believed it was "highly likely that [Father] will stay sober [after completing the program] but that's up to him."  *Id*. at 237-38.  However, given the "tremendous amount of structure and oversight" in the program, Swain agreed that the real test is whether an individual can maintain sobriety after discharge and that it was too early to determine whether Father would succeed in a less restrictive environment.  *Id*. at 239.  Nonetheless, Swain

---

[4] It is unclear from the record when Father was convicted of these felonies.

believed Father's success in the program would also make him successful after discharge.

[20] In essence, Father argues that the juvenile court erred in weighing his past behavior more heavily than his recent improvements in concluding the conditions that led to Child's removal and continued placement outside of his care will not be remedied. We view this as an invitation to reweigh the evidence in Father's favor, which we cannot do. *Bester*, 839 N.E.2d at 147. As our supreme court has explained, the juvenile court is entrusted with carefully balancing a parent's fitness at the time of the termination hearing versus a pattern of conduct. *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). Accordingly, the juvenile court

> has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. Requiring [juvenile] courts to give due regard to changed conditions *does not* preclude them from finding that parents' past behavior is the best predictor of their future behavior.

*Id*. (emphasis added) (citations and internal quotation marks omitted). Here, the juvenile court specifically concluded that Father's past behavior rather than his recent progress through a court-ordered program was the best predictor of his future behavior: "given Father's lengthy history of substance abuse, his recent participation in services related to his addiction does not discount the years of non-compliance in these proceedings." Appealed Order at 16. Furthermore, the juvenile court also noted that Father's recent sobriety "has only been accomplished with strict oversight and the threat of incarceration.

For nearly three years the goal of reunification was not sufficient to motivate [him]." *Id*.

Ultimately, the evidence in the record demonstrates a pattern of incarceration, substance abuse, criminal activity, and failure to successfully complete services. Therefore, we find that DCS presented sufficient evidence to support the juvenile court's conclusion that there was a reasonable probability that the conditions that led to Child's removal and continued placement outside of Father's care, namely his instability, will not be remedied.

# Conclusion

In sum, we conclude there was sufficient evidence to support the juvenile court's conclusion that a reasonable probability existed that the reasons for Child's removal and continued placement away from Father will not be remedied. Thus, the judgment of the juvenile court is not clearly erroneous. Accordingly, we affirm.

Affirmed.

Mathias, J., and Pyle, J., concur.